# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DIPITO LLC, a Montana Limited Liability Company d/b/a San Diego Motorwerks; CHIDIEBERE AMADI, an individual; RICHARD JOHN HAGEN, an individual d/b/a Euromotorwerks; CARRIE SORRENTO, an individual,

Plaintiffs,

v.

MANHEIM INVESTMENTS, INC. d/b/a Manheim Riverside; GREATER NEVADA AUTO AUCTIONS, LLC d/b/a Manheim Nevada; CARFAX, INC.; NEXTGEAR CAPITAL; DANNY BRAUN, an individual; CESAR ESPINOSA, an individual; STEVE HARMON, an individual; JERRY SIDERMAN, an individual; BMW FINANCIAL SERVICES NA, LLC; CENTER AUTOMOTIVE, LLC, d/b/a Center BMW; and DOES 1 through 200, inclusive,

Defendants.

Case No.:  3:21-cv-01205-H-JLB

**ORDER GRANTING IN PART AND DENYING IN PART:**

**MOTIONS TO DISMISS, OR TO TRANSFER VENUE, OR TO COMPEL ARBITRATION, OR TO STAY, FILED BY MANHEIM RIVERSIDE, MANHEIM NEVADA, NEXTGEAR CAPITAL, DANNY BRAUN, CESAR ESPINOSA, AND STEVE HARMON;**

**MOTION TO DISMISS FILED BY BMW FINANCIAL SERVICES NA, LLC;**

**MOTIONS TO DISMISS, OR TO TRANSFER VENUE, OR TO COMPEL ARBITRATION, OR TO STAY, FILED BY CARFAX, INC.**

[Doc. Nos. 23, 25, 28, 42, and 43.]

On July 1, 2021, Plaintiffs filed a Complaint alleging that the Defendants engaged in fraud, misrepresentations, and violations of various consumer protection laws in connection with the sale of three damaged vehicles (the "Subject Vehicles") to Plaintiffs. (Doc. No. 1.)  In September 2021, several of the Defendants moved to dismiss Plaintiffs'

1

claims, or alternatively, to transfer venue, on the ground that this Court lacks subject-matter and personal jurisdiction.  (Doc. Nos. 23, 25, and 28.)  On October 22, 2021, the Court issued an order requesting that some of the Defendants also file motions to compel arbitration in order to fully develop the record before the Court.  (Doc. No. 40.)  Those motions were filed on November 8, 2021.  (Doc. Nos. 42 and 43.)  The Court held a hearing on all pending motions on December 13, 2021.  Michael Alfred appeared on behalf of the Plaintiffs.  Petrina McDaniel appeared on behalf of Manheim Investments, Inc. (d/b/a Manheim Riverside), Greater Nevada Auto Auctions, LLC (d/b/a Manheim Nevada), NextGear Capital, Danny Braun, Cesar Espinosa, and Steve Harmon.  Rebecca Caley appeared on behalf of BMW Financial Services. [1]  Monique Fuentes appeared on behalf of Carfax, Inc.

## BACKGROUND

### I.   The Parties

Plaintiffs are partly comprised of four related individuals and enterprises that purchase and resell vehicles: Dipito, LLC ("SD Motorwerks"); Richard John Hagen, doing business as EuroMotorwerks; Richard John Hagen, as an individual; and Carrie Sorrento (collectively, "Motorwerks").  Sorrento is the "co-trustee" and operator of SD Motorwerks and the spouse of Hagen.  (Compl. ¶¶ 1, 52.)  Hagen is an employee of SD Motorwerks; he previously conducted business as EuroMotorwerks, which is now inactive.  (Id. ¶¶ 3, 52.)  The remaining plaintiff is Chidiebere Amadi, an individual that received one of the Subject Vehicles from Motorwerks after the vehicle was purchased at auction.  (Id. ¶ 37.)  All Plaintiffs are residents of San Diego, California.  (Id. ¶¶ 1-5.)

Plaintiffs brought this suit against essentially three groups of Defendants:

---

[1]  In a previous joint motion, Plaintiffs and BMW Financial Services acknowledge that Defendant BMW Financial Services NA, LLC was erroneously named BMW of North America, LLC in the Complaint.  (Doc. No. 17.)

First, the "Manheim" Defendants are enterprises that provide vehicle auctioneer services—Manheim Investments, Inc. (d/b/a Manheim Riverside), Greater Nevada Auto Auctions, LLC (d/b/a Manheim Nevada), and NextGear Capital—and their employees—Danny Braun, Cesar Espinosa, and Steve Harmon. (Id. ¶¶ 6-12.) Manheim facilitated the sale of the Subject Vehicles to Motorwerks. (Id. ¶¶ 32, 64, 73.) Plaintiffs allege that the auctioneer companies are "California fictious named LLC[s] operating in California" and subsidiaries of Cox Enterprises, a company domiciled in Atlanta, Georgia. (Id. ¶¶ 6-9.)

Second, the "SV1 Defendants" are two businesses and one individual whose alleged conduct relates only to Subject Vehicle #1. These defendants are: BMW Financial Services NA, LLC ("BMW FS"), Center Automotive, Inc. ("Center"), allegedly doing business as Center BMW, and Jerry Siderman, an individual and resident of Tarzana, California. (Id. ¶¶ 14-16.) Center is a retailer of BMW vehicles and a certified BMW vehicle repair facility in Sherman Oaks, California. (Id. ¶ 16.) Center leased Subject Vehicle #1 to Siderman. (Id.) During Siderman's lease, Subject Vehicle #1 incurred serious damage. (Id. ¶ 29.) Center subsequently made repairs to the vehicle. (Id. ¶ 16.) BMW FS allegedly financed Siderman's lease of Subject Vehicle #1 and "arranged to have [Subject] Vehicle #1 sold utilizing the auction services of Manheim." (Id. ¶ 32.) Motorwerks purchased Subject Vehicle #1 and conveyed it to Amadi. (Id. ¶ 37.)

Third, Carfax, Inc. ("Carfax") issued reports concerning each of the Subject Vehicles to Motorwerks. (Id. ¶¶ 51, 70, 75.) Carfax issues vehicle reports that purport to show accident and damage information. (Id. ¶ 27.) Motorwerks alleges that Carfax's reports "concealed the extent of known damages to [the Subject Vehicles.]" (Id. ¶ 127(e).) Carfax is headquartered in Centreville, Virginia, and is a subsidiary of London-based IHS Markit. (Id. ¶ 13.)

## II.     The Subject Vehicles

Plaintiffs allege that the Defendants engaged in a pattern and practice of knowingly and intentionally concealing defects and damage to the Subject Vehicles. The Subject Vehicles were purchased by Motorwerks via auctions operated by the Manheim in 2019

3

and 2020.   The Court summarizes the allegations concerning each Subject Vehicle as follows.

**Subject Vehicle #1** is a 2016 BMW M6 CPE.   On or about August 1, 2016, Siderman began leasing Subject Vehicle #1 from Center.   (Id. ¶ 32.)   The lease was financed by BMW FS.   (Id.)   The vehicle sustained damage while in Siderman's possession.[2]   (Id. ¶ 33.)   Center serviced the vehicle, but it did not report any significant damages to it.   (Id. ¶ 55.)   Siderman declined to repair some defects during his lease term. (Id. ¶ 37.)   At an unidentified point in time, Motorwerks contacted Siderman and inquired about the damage to the vehicle.   Siderman declined to discuss the damage.   (Id. ¶ 54, Ex. L.)

Plaintiffs allege that Siderman knowingly and wrongfully concealed damages to the vehicle when he returned the vehicle to BMW FS at the end of the vehicle lease term.   (Id. ¶ 60.)   Plaintiffs also allege that Center knew or should have known of the damage to the vehicle and failed to report this damage to BMW FS.   (Id. ¶ 61.)

Motorwerks purchased Subject Vehicle #1 on January 28, 2020 for $53,805 via an auction operated by Manheim.   (Id. ¶ 33, Ex. D.)   BMW FS "placed the vehicle with Manheim for sale" at auction.   (Id. ¶ 56.)   Manheim follows the Arbitration Rules provided by the National Auto Auction Association.   (Id. ¶ 56, Ex. M.)   Plaintiffs' summary of the rules, states in part that:

> (i) the "[a]uction makes no representation or guarantees of any vehicle sold or offered for sale;" (ii) "[a]uction is not party to the contract of the sale;" (iii) "[t]he sales contract is between the Seller and Buyer only;" and (iv) "[s]ellers must disclose permanent structural damages, any structural alterations, [and]

---

[2]  Plaintiffs allege that Siderman was driving Subject Vehicle #1 when it sustained certain damages on or about December 4, 2020, but it appears that this date is intended to be December 4, 2019 in light of Plaintiffs' other factual allegations.   (Id. ¶¶ 33-51.)

4

structural repairs or replacements (certified or non-certified as outlined in this policy prior to selling the vehicle at auction." (Id.)

Motorwerks alleges that BMW FS violated these auction rules when it failed to disclose the hidden defects and damages that existed at the time of the auction. (Id. ¶ 57.) Motorwerks also alleges that Manheim "knowingly and wrongfully concealed defects/damages that were hidden and existing at the time of the auction." (Id. ¶ 58.)

Prior to purchase, Motorwerks allegedly reviewed a Carfax vehicle history report and an Insight Condition Report[3] on Subject Vehicle #1 and relied on these reports in its decision to purchase the vehicle. (Id.) The Carfax report showed minor damage to Subject Vehicle #1, including damage sustained in March 2018, February 2019, and June 2019. (Id. ¶ 51, Ex. B.) Plaintiffs allege that this report failed to adequately report certain damages. (Id. ¶ 59.) The InSight Condition Report showed that Subject Vehicle #1 had minor damage and provided an "AutoGrade" of 3.4. (Id. ¶ 33, Ex. D.) Manheim purportedly performed a "multipoint inspection" prior to the sale, but it did not provide SD Motorwerks with this report. (Id. ¶ 34.)

Motorwerks and Manheim performed post-sale inspections of Subject Vehicle #1 soon after the auction. Manheim performed its standard Post-Sale Inspection. (Id.) Plaintiffs requested the Post-Sale Inspection report, but never received it. (Id.) After receiving Subject Vehicle #1, Motorwerks conducted its own inspection and screening process. (Id. ¶ 35.) The screening process triggered various diagnostic codes which indicated potential malfunctions with the vehicle's drivetrain, Anti-Lock Brake System light, and chassis stabilization. (Id.) Various malfunction warning lights were visible. (Id. ¶ 36.) Motorwerks also identified paint defects on the exterior of the vehicle. (Id.)

Motorwerks contacted Manheim to express concern regarding the vehicle's condition. (Id. ¶¶ 35-36.) Manheim opened an "arbitration ticket" on the vehicle. (Id.)

---

[3] The InSight Condition Report is a standard report prepared by the Manheim Defendants. (Compl. ¶ 58.)

After Motorwerks informed Manheim of the defects, Manheim offered a discount of $755, but refused to accept a return of the vehicle.  (Id.)

Motorwerks purchased Subject Vehicle #1 with the intent of selling it to Amadi.  (Id. ¶ 37.)  Amadi took possession of the vehicle on or about February 4, 2020.  (Id.)  Amadi subsequently took the vehicle for service at least eleven times between February 4, 2020 and August 7, 2020 for a variety of issues; repairs were completed during some of these service trips.  (Id. ¶¶ 38-48.)

On August 25, 2020, Motorwerks requested a replacement copy of the InSight Condition Report from Manheim.[4]  Manheim sent Motorwerks a series of screenshots of the existing InSight Condition Report via email and then a new InSight Condition Report.  (Id. ¶¶ 52-53, Exs. J-K.)  Both reports purport to show that the vehicle has "structural damages" and an "AutoGrade" of 2.4—one point lower than the grade in InSight Condition Report reviewed by Motorwerks prior to its purchase.  (Id.)  On December 2, 2020, Plaintiffs had Subject Vehicle #1 inspected for frame and structural integrity.  (Id. ¶ 50.)  The inspection showed significant damage to the right side of the vehicle and structural damage to the vehicle's rocker panel.  (Id. ¶ 50, Ex. I.)  On or about January 13, 2021, Carfax revised their report "to disclose 'moderate' damages not previously reported."  (Id. ¶ 59, Ex. N.)  Plaintiffs allege that the changes between the two Carfax reports concerning the vehicle "manifested a fair amount of deception."  (Id.)

**Subject Vehicle #2** is a 2008 Bentley Continental.  Motorwerks purchased Subject Vehicle #2 on February 28, 2020 for $49,285 from Premier Nevada Credit via an online auction operated by Manheim.  (Id. ¶¶ 64-66, Ex. N.)  The vehicle was sold as a "Green Light" which includes "buyer protections" as to the vehicle's condition.  (Id.)

As a condition of remitting payment, Motorwerks demanded to see Manheim's inspection report for the vehicle.  (Id. ¶ 66.)  On or about April 10, 2020, Manheim provided

---

[4]  Plaintiffs appear to refer to the InSight Condition Report also as the "Sight Inspection Report" and the "Sight Condition Report."  (Id. ¶ 52.)

the report to Motorwerks. (Id. ¶ 67, Ex. P.) The report contained many defective conditions. (Id.) Motorwerks conducted its inspection and discovered water damage and "25 pages of anomalies and faults." (Id. ¶ 68.)

Motorwerks filed an arbitration claim with Manheim. (Id. ¶ 69.) Ultimately, Manheim accepted the return of the vehicle. (Id.) Manheim then informed Motorwerks that it would be ending its relationship due to the number of arbitrations filed by Motorwerks. (Id., Ex. R.) This decision prompted Motorwerks to investigate Subject Vehicle #2's history in greater detail. (Id. ¶ 70.) On or about September 15, 2020, Motorwerks ran a Carfax report that did not show any significant damages and an Insight Condition Report that assigned the vehicle an AutoGrade of 2.0. (Id. ¶¶ 70-72.) The InSight Condition Report showed "22 different damages" and "significant structural and paint damage." (Id. ¶ 72.)

**Subject Vehicle #3** is a 2009 Chevrolet Corvette. Motorwerks purchased Subject Vehicle #3 on June 7, 2019 for $31,910 from Premier Nevada Credit via an online auction operated by Manheim. (Id. ¶ 73, Ex. W.) This vehicle was a sold as "Red Light" because it was previously "modified." (Id.) The InSight Condition Report assigned the vehicle a grade of 3.9. (Id. ¶ 74.) A Carfax report was generated prior to the sale. (Id. ¶ 75.)

Motorwerks picked up the vehicle on the day of the auction. The vehicle was driven approximately 3 miles before the engine sustained "catastrophic" failure. (Id. ¶ 76.) On June 12, 2019, Motorwerks ran a diagnostic test on the vehicle and identified numerous issues. (Id. ¶ 77.) Manheim would not accept a return of the vehicle. (Id.) On June 13, 2019, Manheim provided Motorwerks with an inspection report listing more than five pages of damages to the vehicle and assigning the vehicle a grade of 1.3. (Id. ¶ 78.) This information was not provided to Motorwerks prior to purchase; if it was, Motorwerks would not have purchased the vehicle. (Id. ¶¶ 78-79.)

## III.   Plaintiffs' Claims

The crux of Plaintiffs' Complaint is that the Defendants owed a duty to disclose the damages to the Subject Vehicles to the Plaintiffs, the Defendants knowingly and

intentionally breached that duty by misrepresenting the condition of the Subject Vehicles and concealing material facts, and Plaintiffs were injured by their reliance on Defendants' omissions and misrepresentations.  Plaintiffs allege that "each of the Defendants were acting as agents, employees, assigns and/or contractors of one another."  (Id. ¶ 62.) Plaintiffs bring seven claims under California and federal law against each Defendant: (i) Violation of the California Consumer Legal Remedies Act; (ii) Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act; (iii) Breach of Implied Warranty Pursuant to the Magnuson-Moss Warranty Act; (iv) Quasi-contract/Restitution; (v) Violation of Section 17200 of the California Business and Professions Code; (vi) Wire Fraud, Deceit, and Misrepresentation; and (vii) Violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act.  Plaintiffs seeks the recovery of damages and its costs.

## DISCUSSION

### I. Motions to Transfer

Manheim and Carfax argue that arbitration agreements preclude the Motorwerks Plaintiffs from bringing their claims before this Court.  Manheim and Carfax request that the Court give effect to the arbitration agreements.  At the Court's request, Manheim and Carfax filed motions to compel arbitration in order to fully develop the record before the Court.  However, neither Manheim nor Carfax suggest that this Court should compel arbitration in this district and both recognize that this Court lacks the ability to compel arbitration outside of this district.[5]  Instead, they suggest that the Court may give effect to the arbitration agreements by either: (i) dismissing Motorwerks Plaintiffs' claims against them, (ii) transferring each respective part of this case to the federal district court in the respective forum-selection clauses, or (iii) staying this case so that the relevant parties may

---

[5]  See Cont'l Grain Co. v. Dant & Russell, 118 F.2d 967, 968-69 (9th Cir. 1941) (disallowing a court from ordering arbitration in any venue outside its district); Homestake Lead Co. of Mo. v. Doe Run Res. Corp., 282 F. Supp. 2d 1131, 1143 (N.D. Cal. 2003) (noting that Continental Grain remains controlling authority, in spite of various challenges from other circuits).

proceed with arbitration. The Court concludes that a transfer of this case is appropriate and in the interest of justice. Manheim and Carfax's respective motions to transfer are granted and their alternative motions to dismiss, motions to compel arbitration, and motions to stay pending arbitration, are denied as moot as to the Motorwerks Plaintiffs without prejudice for the following reasons.

A.   Legal Standard Governing Transfer Pursuant to 28 U.S.C. § 1404(a)

Under 28 U.S.C. § 1404(a), a district court "[f]or the convenience of parties and witnesses, in the interest of justice may transfer any civil action to any other district or division where it might have been brought . . . ." This provision gives "discretion [to] the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). The district court must weigh multiple factors to determine whether transfer is appropriate in a particular case. Id. Manheim and Carfax claim that enforceable forum selection clauses exist in their respective arbitration agreements. "Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" Atl. Marine Const. Co. v. U.S. Dist. Ct. for Western Dist. of Texas, 571 U.S. 49, 62-63 (2013). However, the "calculus changes . . . when the parties' contract contains a valid forum selection clause, which 'represents the parties' agreement as to the most proper forum.'" Id. (quoting Stewart Org., Inc., 487 U.S. at 31). The "enforcement of valid-forum selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interest of the justice system." Id. (quoting Stewart Org., Inc., 487 U.S. at 33 (Kennedy, J., concurring)). Thus, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." Atl. Marine, 571 U.S. at 63 (internal quotations omitted).

The presence of a valid forum-selection clause requires the district court to adjust its usual Section 1404(a) analysis in three ways: (1) plaintiff's choice of forum merits no weight, instead, the plaintiff must bear the burden of showing why the district court should

not transfer the case to the forum to which the parties agreed; (2) the district court should not consider arguments about the parties' private interests (i.e., inconvenience for themselves, their witnesses, or their pursuit of the litigation) and the district court must deem the private-interest factors to weigh entirely in favor of the preselected forum; and (3) when a party bound by a forum-selection clause flouts its contractual obligations and files suit in a different forum, a Section 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules. Id. at 63-66. A district court may consider arguments about public-interest factors only. Id. at 64. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id. The plaintiff seeking to bring its case in the forum not designated in the forum-selection clause, "must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed." Yei A. Sun v. Advanced China Healthcare, Inc., 901 F.3d 1081, 1087 (9th Cir. 2018).

Prior to analyzing the motions to transfer through the framework set forth in Atlantic Marine, the Court must first determine whether the forum-selection clauses are valid. "A forum-selection clause is presumptively valid; the party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground upon which we will conclude the clause is unenforceable." Doe 1 v. AOL LLC, 552 F.3d 1077, 1083 (9th Cir. 2009) (citing M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 17 (1972)); Gemini Technologies, Inc. v. Smith & Wesson Corp., 931 F.3d 911, 914 (9th Cir. 2019). A forum-selection clause will be controlling unless the plaintiff makes a "strong showing that: (1) the clause is invalid due to 'fraud or overreaching,' (2) 'enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision,' or (3) 'trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court.'" Sun, 901 F.3d at 1088 (quoting Bremen, 407 U.S. at 15).

B.     Validity and Enforceability of the Manheim Forum-Selection Clauses

1.     **Manheim's Forum-Selection Clauses**

Manheim asserts that the Motorwerks Plaintiffs repeatedly agreed to Manheim's Terms and Conditions, including the arbitration and forum-selection provisions.  (Doc. No. 42 at 1.)  Manheim submitted a declaration from Ms. Veronica Tai, Director of Product Management for Manheim's parent company in support of their motion.  (Doc. No. 23-2, hereinafter "Tai Decl.")  Manheim represents that its auto dealer customers "must accept the Manheim Terms and Conditions before they can access Manheim's auctions" and that Manheim's customers "accept the Manheim Terms and Conditions either online or in person at a kiosk at the auctions." (Tai Decl. ¶¶ 10-11.)  Manheim states that its customers must affirmatively click "I agree" to accept Manheim's Terms and Conditions prior to receiving access to Manheim's auctions.  (Id. ¶ 11.)  When the Terms and Conditions are modified, Manheim's auto dealer customers are purportedly provided with a copy of the new Terms and Conditions and must affirmatively accept the new Terms and Conditions when logging into their Manheim account either at the kiosk or online for the first time following the modification.  (Id. ¶ 12.)

According to Manheim's records, Plaintiff Richard John Hagen and Plaintiff Carrie Elin Sorrento accepted various versions of Manheim's Terms and Conditions.  (Id. ¶¶ 15-16.)  Hagen is purportedly listed in Manheim's records as a representative of Euro Motorwerks and EuroMotorwerks LLC.  (Id. ¶ 15.)  Hagen accepted Manheim's Terms and Conditions on the Manheim.com website on three different instances: (1) Version 1.6 of the Terms and Conditions on September 12, 2015, on behalf of Euro Motorwerks; (2) Version 1.7 on August 4, 2018, on behalf of Euro Motorwerks and EuroMotorwerks LLC; and (3) Version 1.8 on November 15, 2019, on behalf of EuroMotorwerks LLC.  (Id. ¶ 15, Ex. A to Tai Decl.)  Sorrento is purportedly listed as a representative of SD Motorwerks and accepted Manheim's Terms and Conditions on three separate instances: (1) Version 1.7 on February 7, 2020; (2) Version 1.8 on November 29, 2019; and (3) Version 2.0 on September 26, 2020.  (Id. ¶ 16, Ex. B to Tai Decl.)

Plaintiffs allege that Subject Vehicle #1 was purchased by SD Motorwerks from Manheim on or about January 28, 2020, Subject Vehicle #2 was purchased by SD Motorwerks from Manheim on or about February 28, 2020, and Subject Vehicle #3 was purchased by SD Motorwerks on or about June 7, 2019. (Compl. ¶¶ 32, 64, 73.) Manheim contends that either Versions 1.7 or 1.8 of the Terms and Conditions were in effect at the time the Subject Vehicles were purchased. (Id. ¶¶ 19-20.) Manheim's records purport to show that Hagen and Sorrento had accepted Version 1.8 of the Terms and Conditions prior to the purchase of Subject Vehicles #1 and #2. (Id. ¶¶ 15-16.) Further, the records show that Hagen had accepted Version 1.7 of the Terms and Conditions prior to the purchase of Subject Vehicle #3, but Sorrento had not accepted any of the Terms and Conditions. (Id.) Regardless, Plaintiffs' submissions show that EuroMotorwerks, via Hagen, was the purchaser of Subject Vehicle #3. (Compl., Ex. W (stating the "Buyer" as "Euromotorwerks LLC" and the "Buyer Rep" as "Richard Hagen," Ex. X (same).)

Manheim submitted Versions 1.7 and 1.8 of the Terms and Conditions for the Court's consideration. (Doc. No. 23-2, Exhibits C and D, respectively.) Both agreements include an identical "choice of law and consent to jurisdiction" provision. That provision states the following:

> "**Choice of Law and Consent to Jurisdiction**: These terms and conditions shall be governed by the internal laws of the State of Georgia (U.S.A.), where Manheim maintains its headquarters, and without regard to Georgia's internal conflicts of law analysis. In the event that any claim or dispute between Manheim and you is not arbitrated under Section 26 hereof, you agree that non-exclusive jurisdiction and venue for such claims and disputes shall exist in the federal and state courts located in Fulton County, Georgia. You further agree and acknowledge that you may not sue Manheim in any jurisdiction or venue except Fulton County, Georgia."

(Doc. No. 23-2, Ex. C ¶ 25 and Ex. D ¶ 25.)  Further, the arbitration provisions of Versions 1.7 and 1.8 of the Terms and Conditions provide that if arbitration does take place, then "[t]he laws of the State of Georgia will apply . . . [and] [a]ny arbitration will be held in Atlanta, Georgia, unless otherwise agreed upon by the parties in writing."  (Doc. No. 23-2, Ex. C ¶ 26(d) and Ex. D ¶ 26(d).)

### 2.    Validity of the Manheim Forum-Selection Clauses

Plaintiffs argue that Manheim's forum-selection clauses are invalid and unenforceable due to fraud (Compl. ¶ 24; Doc. No. 31 at 4-6; Doc. No. 44 at 6-8), and unconscionability (Doc. No. 31 at 4-7; Doc. No. 44 at 6-8).  Although Plaintiffs primarily address the purported arbitration agreement between Motorwerks and Manheim, Plaintiffs assert that these same arguments "moot[]" any transfer of venue.  (Doc. No. 44 at 3.)  The Court construes Plaintiffs' claims as challenges to the motion for transfer of venue on the basis of an invalid forum-selection clause under category one of the Sun framework.

First, the Court turns to Plaintiffs' claims that the Manheim forum-selection clauses are invalid because of fraud.  Plaintiffs' theory is that fraud precluded mutual assent to the agreement.  Plaintiffs' fraud allegations focus generally on a purported fraudulent scheme by the Defendants.  (Compl. ¶ 24 ("Plaintiff alleges that the Defendants were conducting business in California, engaging in a pattern of systematic fraudulent activities with Plaintiff in this District, resulting in injury to Plaintiff's respective interests in business or property.  All agreements, if any, related to venue outside this District are null and void due to their fraudulent nature."); Doc. No. 31 at 6 ("Manheim engaged in a pattern and practice of selling known defective vehicles while concealing those known defects.  This is alleged fraudulent activity which would void the enforcement of the contract.  There cannot be mutual assent to fraudulent conduct."); Doc. No. 44 at 7 (same).)  However, Plaintiffs' Complaint and briefs lack any allegation of fraud as to the forum-selection clause itself.

In order "[t]o establish the invalidity of a forum-selection clause on the basis of fraud or overreaching, the party resisting enforcement must show that the inclusion of that clause

in the contract was the product of fraud or coercion." Petersen v. Boeing Co., 715 F.3d 276, 282 (9th Cir. 2013); Richards v. Lloyds's of London, 135 F.3d 1289, 1297 (9th Cir. 1998) ("For a party to escape a forum selection clause on the grounds of fraud, it must show that the inclusion of that clause in the contract was the product of fraud or coercion."); Indep. Fin. Group, LLC v. Quest Trust Co., 2021 WL 2550397, at *4 (N.D. Cal. 2021) ("it is well-established that the addition of the forum-selection clause itself must have been fraudulent" for the clause to be deemed invalid on the basis of fraud). Mere conclusory allegations of fraud are insufficient to invalidate a forum-selection clause. See Spradlin v. Lear Siegler Mgmt. Servs. Co., Inc., 926 F.2d 865, 868 (9th Cir. 1991). Further, several district courts have found general allegations of fraud, similar to those raised by the Plaintiffs, to be lacking. See, e.g., Indep. Fin. Group, LLC, 2021 WL 2550397, at *4; Brown v. Artec Global Media, Inc., 2017 WL 11596885, at *4 (S.D. Cal. 2017); Washington v. Cashforiphones.com, 2016 WL 6804429, at *5 (S.D. Cal. 2016).

In the Ninth Circuit, the exemplar of fraud in a forum-selection clause is Peterson v. Boeing Co., 715 F.3d 276, 282-83 (9th Cir. 2013). In Peterson, the plaintiff alleged that he signed an employment contract without a forum-selection clause prior to moving to Saudi Arabia for a job. Once he arrived, plaintiff was allegedly required to sign a new contract with a forum-selection clause. He was not provided with time to read the agreement and he was under the pressure of being forced to return immediately to the United States at his own expense if he did not sign the new agreement. Id. Plaintiffs allege no similar fraud or duress here. Plaintiffs do not claim that they were unable to read the agreement. Nor do they claim that they signed the agreement as a result of duress or deceit. Plaintiffs' general fraud claims are insufficient to invalidate the forum-selection clauses.

Second, the Court analyses Plaintiffs' claim that the agreement—and by extension, forum-selection clause—is unconscionable overreach. Plaintiffs' argument is based on the theory that: (i) Manheim's Terms and Conditions are contracts of adhesion that were presented on a "take it or leave it" basis (Doc. No. 44 at 7-8); (ii) the arbitration election clause is "one-sided" and "overly harsh" (id.); and (iii) that Plaintiffs are "lay persons" and

did not understand the "complicated" Terms and Conditions (id. at 8; Doc. No. 44-1 ¶¶ 7-8, 12-15).

Contrary to Plaintiffs' view, "take it or leave it" adhesion contracts do not necessarily render a forum-selection clause unenforceable. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593-94 (1991); see also Crawford v. Beachbody, LLC, 2014 WL 6606563, at *5 (S.D. Cal. 2014). While the Supreme Court suggested in Bremen, 407 U.S. at 12, that "overreaching" includes "undue influence" or "overweening bargaining power," the Ninth Circuit has held that unequal bargaining power alone does not render a forum selection clause unenforceable. Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1141 (9th Cir. 2004). In Murphy, the Ninth Circuit held that plaintiff's allegations that (i) he only completed formal education through the tenth grade, (ii) he was informed the contract was not negotiable, and (iii) he only signed the contract to retain his employment were "not enough to overcome the strong presumption in favor of enforcing forum selection clauses." Id.

This case is no different. Plaintiffs' claims that they are lay persons with no legal training and did not have any "real" opportunity to negotiate any of the Terms and Conditions are analogous to the plaintiff's claims in Murphy. Further, Plaintiffs' suggestion, without specificity, that the agreement was unconscionable because there was no mutual assent is lacking. Plaintiffs do not dispute the evidence submitted by Manheim that purports to show that Plaintiffs Hagen and Sorrento accepted Manheim's Terms and Conditions on three different occasions each. (Doc. No. 44.) Nor does Plaintiff Hagen state in his declaration that he did not accept Manheim's Terms and Conditions. (Doc. No. 44-1.) Plaintiffs' arguments that the arbitration provision is "one-sided" and "overly harsh" are inapplicable to the forum-selection clause. Accordingly, the Plaintiffs fail to demonstrate that the forum-selection clauses are invalid on the basis of overreach.

### 3.    Enforceability of the Manheim Forum-Selection Clauses

Since valid forum-selection clauses exist between Manheim and Motorwerks, Plaintiffs "must bear the burden of showing why the court should not transfer the case to

the forum to which the parties agreed." Sun, 901 F.3d at 1087.  "A valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  Atl. Marine, 571 U.S. at 63 (internal quotations omitted).  The district court neither gives weight to plaintiff's choice of forum nor considers the parties' private interests (i.e., inconvenience for themselves, their witnesses, or their pursuit of the litigation).  Id. at 63-66.

This Court may only consider arguments about public-interest factors.  Id. at 64.  "Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law."  Id. at 63 n. 6.  Still, "those factors will rarely defeat a transfer motion" and the "forum-selection clauses should control except in unusual cases."  Id. at 64.

Plaintiffs assert that a transfer would constitute substantial injustice because Georgia is "not substantially connected to any of the allegations in the complaint."  (Doc. No. 44 at 8.)  Plaintiffs do not raise any other public interest arguments.  While Motorwerks are California-based entities and individuals, California's local interest is not sufficiently strong to defeat the motion for transfer.

Motorwerks' purchases of the Subject Vehicles through Manheim took place over the Internet.  (Compl. ¶¶ 34, 64, and 73.)  Motorwerks retrieved Subject Vehicle #1 in Riverside, California, and Subject Vehicles #2 and #3 in Las Vegas, Nevada.  (Doc. No. 1, Exs. A, O, and W.)  Motorwerks remitted payments for the vehicles to Manheim's address in Atlanta, Georgia.  (Id., Exs. O and W.)  The Manheim entities are allegedly all subsidiaries of Cox Enterprises, which is based in Atlanta.  (Id. ¶¶ 6-9.)  Finally, the Court notes that the purported the choice of law provision in Section 25 of Manheim's Terms and Conditions provides that "[t]hese terms and conditions shall be governed by the internal laws of the State of Georgia (U.S.A.), where Manheim maintains its headquarters, and without regard to Georgia's internal conflicts of law analysis."  (Doc. No. 23-2, Ex. C ¶ 25 and Ex. D ¶ 25.)  This is not an "exceptional case" that warrants departure from the agreed upon forum-selection clause.  Atl. Marine, 571 U.S. at 63.  In sum, the Court grants

Manheim's motion to transfer Plaintiffs' Complaint as it relates to the claims of Plaintiffs (i) Dipito LLC d/b/a San Diego Motorwerks, (ii) Richard John Hagen d/b/a Euromotorwerks, (iii) Richard John Hagen as an individual, and (iv) Carrie Sorrento as an individual against (i) Manheim Riverside a/k/a Cox Auto Inc. a/k/a Manheim Investments Inc. a/k/a Cox Auto Auctions, LLC; (ii) Manheim Nevada a/k/a Cox Auto Inc., a/k/a Manheim Investments Inc. a/k/a Cox Auto Auctions, LLC; (iii) Danny Braun; (iv) Cesar Espinosa; and (v) Steve Harmon to the United States District Court for the Northern District of Georgia.

### C. Transfer of the Remaining Claims Related to Manheim

The Court's transfer of the aforementioned claims does not address all of Plaintiffs' claims against the Manheim Defendants.  No party contends that Plaintiff Amadi is subject to the Motorwerks-Manheim forum-selection clauses or the purported arbitration agreement.  (See Doc. No. 42 at 21 n. 4.)  Nor does Manheim contend that Plaintiffs' claims against NextGear Capital, a subsidiary of Manheim's parent company, are subject to the forum-selection clauses or the purported arbitration agreement.  (Id.)  Rather, the Manheim Defendants move to dismiss Plaintiff Amadi's claims and the claims against NextGear Capital pursuant to Fed. R. Civ. P. 12(b)(6).  The Court addresses that part of Manheim's motion elsewhere in this Order.

### D. Validity and Enforceability of the Carfax's Forum-Selection Clause

#### 1. Carfax's Forum-Selection Clause

The Court now turns to its analysis of Carfax's purported forum-selection clause. Like Manheim, Carfax asserts that the Motorwerks Plaintiffs repeatedly agreed to certain terms and conditions as part of their commercial relationship.  Carfax asserts that EuroMotorwerks, through Hagen and another EuroMotorwerks representative, Sam Mugbel, entered into three separate agreements to use Carfax's products and services. (Doc. No. 43-1 at 2; Doc. No. 43-2, Decl. of Melinda Genovese ¶¶ 4-6 ("Genovese Decl.").)  These agreements are: (i) the "Advantage Agreement," which concerns Carfax's "Advantage Program" through which car dealers pay a flat monthly fee for unlimited

access to Carfax's vehicle history report ("VHR") products, and began on or about April 6, 2015; (ii) the "Retargeting Agreement," which concerns Carfax's "Enhanced Used Car Listings and Retargeting programs," and began on or about March 8, 2017; and (iii) the "UCL Agreement," which was a second agreement for "Enhanced Used Car Listings," and began on or about October 10, 2018. (Doc. No. 43-1 at 2; Genovese Decl. ¶¶ 4-6.) Carfax asserts that Hagen contacted Carfax on or about November 26, 2019—after the purchase of Subject Vehicle #3 and prior to the purchases of Subject Vehicles #1 and #2—to inform Carfax that EuroMotorwerks was changing its name to SD Motorwerks. (Doc. No. 43-1 at 2; Genovese Decl. ¶ 8.)  Carfax claims that SD Motorwerks assumed the EuroMotorwerks contracts, including the Advantage Agreement, and agreed to be bound by it. (Doc. No. 43-1 at 2; Genovese Decl. ¶¶ 8-9.) SD Motorwerks purportedly paid the required monthly fee for the Advantage Program and accessed a Carfax account to generate VHRs, including the VHRs that are at issue in the Complaint. (Doc. No. 43-1 at 2-3; Genovese Decl. ¶ 9.)

According to Carfax, once Motorwerks entered into the Advantage Agreement, they agreed to be bound by the Carfax Services Terms and Conditions. (Doc. No. 43-1 at 3.) Carfax argues that all three of the agreements that were signed by the Motorwerks Plaintiffs "state unambiguously that the signing party . . . agrees that he or she 'understand[s] that' the Application is 'subject to the CARFAX Services Terms and Conditions (available online at http://carfaxfordealers.com/service-terms-and-conditions/ or by calling 855-845-5733.)'" (Doc. No. 43-1 at 4; Doc. No. 43-3, Ex. A, Advantage Agreement; Doc. No. 43-4, Ex. B, Retargeting Agreement; Doc. No. 43-5, Ex. C, UCL Agreement.) Carfax asserts that the "signatory represents that he or she is duly authorized to execute the Application on behalf of Customer and bind Customer to the terms of both the Application and the CARFAX Services Terms and Conditions." (Id.; Doc. No. 43-3, Ex. A, Advantage Agreement; Doc. No. 43-4, Ex. B, Retargeting Agreement; Doc. No. 43-5, Ex. C, UCL Agreement.) Carfax's Terms & Conditions contain a forum selection clause that states:

"**Jurisdiction and Venue**. If for any reason a Dispute proceeds in court rather than in arbitration or small claims court, each party waives any right to a jury trial and agrees that any such proceeding shall be conducted only on an individual basis and not in a class, representative, consolidated or mass action.  Under such circumstances, except for a collection action by CARFAX, Customer and CARFAX agree that the jurisdiction and venue shall be vested exclusively in the state courts in Fairfax County, Virginia, or the U.S. District Court for the Eastern District of Virginia, Alexandria Division.  If any part of this Section 52(c) is found to be unenforceable, the remainder of Section 52 and this Section 52(c) shall still be given full force and effect."

(Doc. No. 43-6, Ex. D, Carfax's Terms and Conditions ¶ 52(c).)  Further, Carfax's Terms and Conditions provide that if arbitration does take place, then "[t]he Federal Arbitration Act, applicable federal law, and laws of the Commonwealth of Virginia" apply and that any arbitration hearing will be held in Washington, D.C.  (Id. ¶ 52(a)(iv), (b).)

## 2.   Validity of Carfax's Forum-Selection Clause

The Court must first determine whether Carfax's forum-selection clause is valid and enforceable.  Plaintiffs raise similar challenges to Carfax's forum-selection clause as they did against Manheim's forum-selection clauses.  Plaintiffs argue that (i) the forum-selection clause is invalid and unenforceable due to fraud (Compl. ¶ 24), (ii) there was not mutual assent to the forum-selection clause (Doc. No. 37 at 4-8; Doc. No. 44 at 6-8), and (iii) even if there was mutual assent, the agreement is unconscionable on other grounds (Doc. No. 37 at 4-8; Doc. No. 44 at 6-8).  Although Plaintiffs primarily address the purported arbitration agreement between Motorwerks and Carfax, Plaintiffs assert that these same arguments "moot[]" any transfer of venue.  (Doc. No. 45 at 9.)  The Court construes Plaintiffs' claims as challenges to the motion for transfer of venue on the basis of an invalid forum-selection clause under category one of the Sun framework.

First, the Court turns to Plaintiffs' claims that the Carfax forum-selection clause is invalid due to fraud. Plaintiffs only plead allegations concerning the fraudulent scheme generally. (Compl. ¶ 24 ("Plaintiff alleges that the Defendants were conducting business in California, engaging in a pattern of systematic fraudulent activities with Plaintiff in this District, resulting in injury to Plaintiff's respective interests in business or property. All agreements, if any, related to venue outside this District are null and void due to their fraudulent nature."); Doc. No. 45 at 12 ("It would be illogical to allow the perpetrator of fraud the opportunity to legally execute contract provisions compelling the arbitration of contractual clauses which permit the perpetrator the luxury of continuing his fraudulent practices.").) Plaintiffs' Complaint and briefs lack the necessary allegations of fraud as to the forum-selection clause itself. Petersen v. Boeing Co., 715 F.3d 276, 282 (9th Cir. 2013) ("To establish the invalidity of a forum-selection clause on the basis of fraud or overreaching, the party resisting enforcement must show that the inclusion of that clause in the contract was the product of fraud or coercion."). Plaintiffs do not claim they were unable to read the agreement or that they signed the agreement because of duress or deceit. See id. at 282-83. Plaintiffs' general fraud claims are insufficient to invalidate the Carfax forum-selection clause.

Second, the Court considers Plaintiffs' claim that the forum-selection clause lacked mutual assent. Plaintiffs appear to argue that the Motorwerks Plaintiffs are not bound by the purported Carfax agreements or Terms and Conditions because those allegations concern EuroMotorwerks. (Doc. No. 37 at 4-6.) According to Plaintiffs, "Euromotorwerks is not a party to the subject Complaint. Any facts pertaining to Euromotorwerks are irrelevant." (Id.)

Regardless, the allegations concerning EuroMotorwerks are relevant to the determination of whether the forum-selection clause is valid and enforceable. Carfax alleges that Hagen contacted Carfax to change EuroMotorwerks's account name to SD Motorwerks on November 26, 2019. (Doc. No. 43-1 at 2; Genovese Decl. ¶ 8.) In his declaration, Hagen states that he "acted as an auction buyer for the benefit of [SD

20

Motorwerks] from October/November 2019 until approximately May 2020." Hagen Decl. ¶ 6. According to Carfax, from November 26, 2019 onward, SD Motorwerks assumed EuroMotorwerks's agreements. (Doc. No. 43-1 at 2-3.) SD Motorwerks continued using the same Carfax account to generate some of the VHRs at issue in the Complaint. (Id.) Notably, Plaintiffs submitted Carfax reports as exhibits to their Complaint. Three of those reports were retrieved after November 26, 2019, and all list SD Motorwerks in their caption. (Compl. ¶¶ 59, 70; Compl. Exs. B, N, and S.) One of the reports was retrieved prior to November 26, 2019, and it lists "EuroMotorWerks" in its caption. (Compl. ¶ 75; Compl. Ex. Z.) Plaintiffs do not contest the allegations that SD Motorwerks assumed control of the EuroMotorwerks account or that SD Motorwerks retrieved several of the VHRs at issue in the Complaint through the Advantage Program. Thus, Plaintiffs have failed to allege a reasonable basis upon which the Court could find a lack of mutual assent that would invalidate the forum-selection clause under the Sun framework.

Third, the Court analyses Plaintiffs' claim that the agreement—and by extension, forum-selection clause—is overreaching. Plaintiffs' argument is based on the theory that: (i) Carfax's agreements and Terms and Conditions are contracts of adhesion that were presented on a "take it or leave it" basis (Doc. No. 45 at 7-8); (ii) Carfax's Terms and Conditions are only incorporated by reference and not set forth in full on the agreements signed by EuroMotorwerks (id.); and (iii) that Plaintiffs are "lay persons" and have no recollection of the arbitration or choice of law provisions (id.).

As stated supra, an adhesion contract and unequal bargaining power does not necessarily render a forum-selection clause unenforceable. Carnival Cruise Lines, Inc., 499 U.S. at 593-94; Murphy, 362 F.3d at 1141. For the same reasons set forth in the Court's analysis concerning the Manheim Terms and Conditions, Plaintiffs' claims that they are lay persons with no legal training and did not have any "real" opportunity to negotiate any of the Terms and Conditions are insufficient to invalidate the forum-selection clause. See Murphy, 362 F.3d at 1141.

3:21-cv-01205-H-JLB

Further, the forum-selection clause was not invalidated by the incorporation of the Terms and Conditions by reference.  "The formation of the contract with the forum selection clause . . . [is] governed by state contract law principles." <u>Democracy Council of Cal. v. WRN Ltd., PLC</u>, 2010 WL 3834035, at *3 (C.D. Cal. 2010).  Carfax's incorporation by reference was acceptable under California law.[6]  Under California law, "[f]or the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." <u>Troyk v. Farmers Group, Inc.</u>, 171 Cal. App. 4th, 1305, 1331 (Cal. Ct. App. 2009) (internal quotation omitted).  "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'" <u>Id.</u> (internal citations omitted).  Each Carfax agreement at issue explicitly states near the signature line that "I understand that this Application is subject to the CARFAX Services Terms and Conditions (available online at http://carfaxfordealers.com/service-terms-and-conditions/ or by calling 855-845-5733.)  I represent that I am duly authorized to execute this Application on behalf of Customer and bind Customer to the terms of this Application and the CARFAX Services Terms and Conditions."  (Doc. Nos. 43-3, 43-4, and 43-5.)  Carfax's agreement presents the Terms and Conditions as freely available online or by phone.  Plaintiffs do not allege otherwise.  Accordingly, the Plaintiffs fail to demonstrate that the forum-selection clauses are invalid on the basis of overreach.

---

[6]  Even if Virginia law were to apply by function of the choice of law provision in Carfax's Terms and Conditions, the Court would reach the same conclusion.  <u>See</u> <u>Power Paragon, Inc. v. Precision Tech. USA, Inc.</u>, 2009 WL 700169, at *9 (W.D. Va. 2009) ("Virginia courts have recognized that parties may incorporate extrinsic documents into their agreement.  The doctrine of incorporation by reference will apply when the primary document explicitly identifies the secondary document to be incorporated." (internal citations omitted)).

### 3.    Enforceability of the Carfax Forum-Selection Clauses

Because a valid forum-selection clauses exist between Carfax and Motorwerks, Plaintiffs bear the burden of showing why the Court should not transfer the case.  Sun, 901 F.3d at 1087.  The Court may only consider public-interest factors.  Atl. Marine, 571 U.S. at 64.  "A valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  Atl. Marine, 571 U.S. at 63 (internal quotations omitted).

Plaintiffs assert that a transfer would constitute substantial injustice because Virginia is "not substantially connected to any of the allegations in the complaint." (Doc. No. 45 at 8.)  Plaintiffs do not raise any other public interest arguments.  As set forth in detail supra, California's local interest is not sufficiently strong to defeat the motion for transfer.  This is not an "exceptional case" that warrants departure from the agreed upon forum-selection clause.  Atlantic Marine Const. Co., 571 U.S. at 63.

In sum, the Court grants Carfax's motion to transfer Plaintiffs' Complaint as it relates to the claims of Plaintiffs (i) Dipito LLC d/b/a San Diego Motorwerks, (ii) Richard John Hagen d/b/a Euromotorwerks, (iii) Richard John Hagen as an individual, and (iv) Carrie Sorrento as an individual against Carfax to the United States District Court for the Eastern District of Virginia, Alexandria Division.

### E.    Transfer of the Remaining Claims Against Carfax

The Court's transfer of the aforementioned claims against Carfax does not address Amadi's claims against Carfax.  No party contends that Amadi is subject to the Carfax-Motorwerks forum-selection clause or the purported arbitration agreement.  (See Genovese Decl. ¶ 3.)  Rather, Carfax moves to dismiss Plaintiff Amadi's claims pursuant to Fed. R. Civ. P. 12(b)(6).  The Court addresses this part of Carfax's motion below.

## II.    Motions to Dismiss

Even after transfer, Plaintiff Amadi's claims against the Manheim Defendants, Carfax, and BMW FS remain pending before this Court.  These Defendants move to dismiss Amadi's claims pursuant to Fed. R. Civ. P. 12(b)(6).  Additionally, the Manheim Defendants move to dismiss all Plaintiffs' claims against NextGear Capital.  BMW FS also

moves to dismiss claims by the SD Motorwerks, EuroMotorwerks, Hagen, and Sorrento. The Court grants the motion to dismiss as to six of Plaintiff Amadi's claims against the Manheim Defendants (and six of all Plaintiffs' claims as to NextGear Capital), Carfax, and BMW FS without prejudice and with leave to amend the Complaint. The Court grants the motion to dismiss as to Plaintiffs' wire fraud claims with prejudice and without leave to amend as amendment would be futile.

### A.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Dismissal under Rule 12(b)(6) is appropriate where "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

In reviewing the plausibility of a complaint, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008). But courts do not accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008). Where a motion to dismiss is granted for failure to state a claim, the Court must then determine whether to grant leave to amend. See Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995); see Telesaurus v. Indus. Tel. Ass'n, Inc., 623 F.3d 998, 1003 (9th Cir. 2010).

Additionally claims sounding in fraud are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that a

plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotation marks omitted); see also Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged.") (internal quotation marks omitted).

### B. Defendants' Challenges to Plaintiffs' Breach of Warranty Claims (Counts II and III)

Plaintiffs assert claims for breach of implied warranty against the Defendants pursuant to California's Song-Beverly Consumer Warranty Act, Ca. Civil Code §§ 1790 et seq., and the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 et seq. (Compl. ¶¶ 96-114.) Plaintiffs did not allege the existence of any express warranties or the violation of any express warranties by the Defendants.

The substantive elements are the same under the Song-Beverly Act and MMWA for a breach of implied warranty. Birdsong v. Apple, Inc., 590 F.3d 955, 958 n. 2 (9th Cir. 2009); see also Skiffington v. Keystone RV Company, 2013 WL 12131716, at *3 (C.D. Cal. 2013). Under both Acts, the Court applies state warranty law. Id. California law requires that "consumer goods meet each of the following: (1) [p]ass without objection in the trade under the contract description[,] (2) [a]re fit for the ordinary purposes for which such goods are used[,] (3) [a]re adequately contained, packaged, and labeled[, and] (4) [c]onform to the promises or affirmations of fact made on the container or label." Cal. Civ.

Code § 1791.1.  Unless properly disclaimed, "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and retail seller's implied warranty that the goods are merchantable."  Id. § 1792.  "Consumer goods" are "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables."  Id. § 1791.

Defendants argue that Plaintiffs' Song-Beverly Act and MMWA claims fail because SD Motorwerks did not purchase Subject Vehicle #1 for "personal, family, or household purposes," but instead with the intention of selling it to Plaintiff Amadi.  (Doc. No. 25 at 9.)  Defendants also assert that Plaintiffs do not plead an actual purchase by Amadi.  (Id.)  Rather, Amadi is claimed to only have gained possession of Subject Vehicle #1.  (Id.)  According to the Defendants, even if Amadi did purchase Subject Vehicle #1 from SD Motorwerks, his claims against the Defendants for breach of an implied warranty would fail because there is a lack of privity of contract between Amadi and the Defendants.  (Id.)

In their opposition, the Plaintiffs contend that Amadi is "a business associate" to the Motorwerks Plaintiffs and a third-party beneficiary to the auction contract between SD Motorwerks and the Defendants.  (Doc. No. 35 at 8-10.)  To counter Defendants' argument that there are no allegations that Amadi purchased Subject Vehicle #1, the Plaintiffs suggest that the Complaint does not state Amadi purchased Subject Vehicle #1 because doing so would be superfluous.  (Id. at 8.)  Amadi is "the owner of Subject Vehicle #1" and is "clearly a consumer under the [A]ct."  (Id. at 10.)  Plaintiffs further imply that the Song-Beverly Act provides relief to SD Motorwerks, because SD Motorwerks is a "person" under the Act.  (Id. at 9.)

First, the Motorwerks Plaintiffs may not bring claims for breach of an implied warranty pursuant to the Song-Beverly Act or the MMWA as a matter of law.  Plaintiffs allege that SD Motorwerks purchased Subject Vehicle #1 "for the benefit of with the intention of selling it to [sic] [Amadi]."  (Compl. ¶ 37.)  This is consistent with the Motorwerks Plaintiffs' business of purchasing and reselling vehicles.  Plaintiffs confirmed in their opposition that SD Motorwerks "sells consumer goods" and stated that SD

Motorwerks "should be protected from unknowingly purchasing and then re-selling defective consumer goods to unsuspecting individual consumers." (Doc. No. 35 at 9.) Since SD Motorwerks purchased Subject Vehicle #1 for a commercial purpose, it may not pursue a claim for an implied warranty under the Song-Beverly Act and the MMWA. The Act only provides an implied warranty of merchantability on "consumer goods," which by definition are "used, bought, or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code §§ 1791(a), 1791.1. Plaintiffs explicitly allege that SD Motorwerks purchased Subject Vehicle #1 for a commercial purpose.

Further, SD Motorwerks's status a "person" pursuant to Cal. Civ. Code § 1791(b) does not mean it receives the protections of the Song-Beverly Act. Section 1791(b) defines person in the context of the statutory definition of "buyer" or "retail buyer." The provision states that buyer or retail buyer means "any individual who buys consumer goods from a person engaged in the business of manufacturing, distributing, or selling consumer goods at retail." Id. § 1791(b). Although SD Motorwerks may be a "person," it is not a "buyer" or "retail buyer" because Subject Vehicle #1 does not qualify as a "consumer good." Accordingly, the Motorwerks Plaintiffs fail to state a claim for relief against the Defendants for a breach of implied warranty under either the Song-Beverly Act or the MMWA.

Second, Amadi also fails to state a claim for relief for breach of an implied warranty. Although Amadi's purchase may satisfy the requirement that a consumer good is "used, bought, or leased for use primarily for personal, family, or household purposes," Amadi cannot show that Subject Vehicle #1 is a "new product." Id. § 1791(a). Plaintiffs allege that Subject Vehicle #1 is a year 2016 vehicle that was leased and driven by Siderman up until November or December 2019. (Compl. ¶ 32.) SD Motorwerks purchased Subject Vehicle #1 from Manheim on or about January 28, 2020. (Id.) Amadi took possession of Subject Vehicle #1 on or about February 4, 2020. (Id. ¶ 37.) Plaintiffs' factual allegations preclude Amadi from claiming that Subject Vehicle #1 fits the "consumer good" definition that is required to bring a claim for an implied warranty under the Song-Beverly Act and the MMWA. Thus, Amadi has failed to state a claim for which relief may be granted.

27

Accordingly, the Court also dismisses Plaintiffs' implied warranty claims (Counts II and III) against the Defendants, but grants Plaintiffs leave to amend to fix the deficiencies in their Complaint.

C.     <u>Defendants' Challenges to Plaintiffs' Fraud Claims (Counts I, V, VI, and VII)</u>

**1.     Plaintiffs' Consumer Legal Remedies Act Claim (Count I)**

The Court begins with Defendants' argument that SD Motorwerks may not bring a claim under the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA") because SD Motorwerks is not a "consumer" under the statute. The CLRA makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices" used in the sale of goods or services to a consumer. <u>Wilens v. TD Waterhouse Group, Inc.</u>, 120 Cal. App. 4th 746, 753 (Cal. Ct. App. 2003). "If the consumer suffers damage as a result of an unlawful act, the consumer can bring an action against the defendant for actual damages, punitive damages, injunctive relief or restitution." <u>Id.</u> A consumer is defined by the CLRA to be "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d).

Defendants argue that Plaintiffs cannot bring a claim under the CLRA because SD Motorwerks is not a consumer. (Doc. No. 25 at 8.) The Court agrees that SD Motorwerks is not a consumer. Plaintiffs' Complaint and briefing supports the view that SD Motorwerks is a business that purchases cars for resale and not for personal, family, or household purchases. <u>See</u> <u>supra</u>. Accordingly, the Court dismisses Motorwerks Plaintiffs' claims against BMW FS pursuant to the CLRA (Count I), but grants Plaintiffs leave to amend to fix the deficiencies in their Complaint.

In regard to Amadi's claims, Defendants argue that even if Amadi is a third-party beneficiary of Motorwerks' purchase, he is still not a "consumer" under the CLRA. The Court agrees. In <u>Schauer v. Mandarin Gems of Cal., Inc.</u>, 125 Cal. App. 4th 949, 961 (Cal. Ct. App. 2005), the California Court of Appeals found that a consumer under the CLRA must be the individual that made the purchase of the good or service. A consumer does

28

not include an individual on whose behalf the purchase was made.  If the plaintiff's ownership of the good "was not acquired as a result of [its] own consumer transaction with defendant [and there was no assignment of rights, then plaintiff] does not fall within the parameters of the consumer remedies under" the CLRA.  Id.  Plaintiffs do not claim that Amadi purchased Subject Vehicle #1 directly through the Manheim auction.  Rather, Plaintiffs claim that Amadi is a third-party beneficiary to the auction contract between SD Motorwerks and BMW FS.  (Doc. No. 35 at 8-10.)  But Amadi's alleged status as a third-party beneficiary does make him a "consumer" under the CLRA.  Schauer, 125 Cal. App. 4th at 961; Vega v. CarMax Auto Superstores California, LLC, 2018 WL 3216347, at *8 (Cal. Ct. App. 2018).  Even if Amadi was a consumer, Amadi still could not bring a claim under the CLRA against the Defendants because there was no transaction between Amadi and the Defendants.  See Morris v. Farmers Ins. Exchange, 2006 WL 3823522, at *6 (Cal. Ct. App. 2006).  Accordingly, the Court also dismisses Amadi's CLRA claim (Count I) against the Defendants, but grants Plaintiffs leave to amend to fix the deficiencies in their Complaint.

## 2.   Plaintiffs' Unfair Competition Law Claim (Count V)

The Court next turns to Defendants' argument that Plaintiffs' fail to allege violations of California's Unfair Competition Law ("UCL") with sufficient particularity to state a claim for relief.   The UCL prohibits any "fraudulent business practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200 et seq. Plaintiffs assert a fraud claim under the UCL.  See Compl. ¶ 126 ("the acts and practices of Defendants are likely to deceive, constituting a fraudulent business act or practice.").  A "fraudulent" business act or practice within the meaning of the UCL is one that is likely to deceive members of the public.  Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012).  The challenged conduct "is judged by the effect it would have on a reasonable consumer."  Id.  But "[u]nlike common law fraud, a [UCL] violation can be shown even without allegations of actual deception, reasonable reliance and damage." Daugherty v. American Honda Motor Co., 144 Cal. App. 4th (Cal. Ct. App. 2006).  "Absent

a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL." Berryman v. Merit Property Mgmt., Inc., 152 Cal. App. 4th 1544, 1557 (Cal. Ct. App. 2007). Plaintiffs allege a unified course of fraudulent conduct and rely entirely on that course of conduct for the basis of their claims against the Defendants under the UCL. Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (2009). Accordingly, Plaintiffs' UCL claims are grounded in fraud. See e.g., Compl. ¶ 124.

Defendants argue that Plaintiffs fail to plead its claims with sufficient particularity. In particular, Defendants note that Plaintiffs' Complaint lacks any allegation that Amadi had communications with them. Given the ambiguity surrounding the relationship of Amadi and the Motorwerks Plaintiffs to Subject Vehicle #1, the Plaintiffs have failed to plead allegations on behalf of Amadi with sufficient particularity. Further, the allegations against NextGear Capital are grouped together with allegations concerning all of the other Defendants. This is insufficient for the heightened pleading standard of fraud. Swartz, 476 F.3d at 764.

### 3.    Plaintiffs' Wire Fraud Claim (Count VI)

Defendants argue that Plaintiffs' Wire Fraud claim pursuant to 18 U.S.C. § 1343 should be dismissed because the statute does not confer a private right of action. The Court agrees. Kingsley v. Ashworth, 1998 WL 75424, at *1 (9th Cir. 1998); Crane v. Bank of New York Mellon, 2012 WL 2620522, at *5 (E.D. Cal. 2012); Diallo v. Redwood Investments, LLC, 2019 WL 3574449, at *7 (S.D. Cal. 2019). Accordingly, the Court dismisses Plaintiffs' Wire Fraud claim (Count VI) against the Defendants with prejudice.

### 4.    Plaintiffs' Racketeer Influenced and Corrupt Organizations Act Claim (Count VI)

A plaintiff may bring a civil suit under the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1964(c). To state a claim under RICO, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996), cert.

dismissed, 519 U.S. 233. A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity within ten years. 18 U.S.C. § 1961(5). Although at least two acts are necessary, they may not be sufficient. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 237-38 (1989). Where a plaintiff alleges RICO claims against multiple defendants, the "plaintiff must allege at least two predicate acts by each defendant." Diallo, 2019 WL 3574449, at *7. Under the heightened pleading standard of Fed. R. Civ. P. 9(b), a plaintiff must identify each defendant's role in the alleged scheme, rather than lumping the allegations concerning multiple defendants together. Id. at 8 (citing Swartz, 476 F.3d at 764).

Plaintiffs allege that the Defendants' predicate acts include "wire fraud, mail fraud, bank fraud, theft by deception, fraud and misrepresentation, and violations of many state and federal laws." Compl. ¶ 158. Plaintiffs argue that the Defendants conspired together to engage in a pattern and practice of racketeering activity. Id. ¶¶ 159-161. Defendants argue that these allegations lack particularity, and that Plaintiffs impermissibly lump all of the Defendants together in their claims. (Doc. No. 39 at 6.) The Court agrees with the Defendants. Plaintiffs lack factual allegations concerning many of the purported "predicate acts." At best, Plaintiff Amadi was the victim of fraud and misrepresentation related to the disclosure of defects with Subject Vehicle #1. But that is only one predicate act. This one predicate act is insufficient to state a claim under RICO. Accordingly, the Court dismisses Plaintiffs' RICO claim (Count VI) against Defendants and grants Plaintiffs leave to amend to fix the deficiencies in their Complaint.

D.   Defendants' Challenge to Plaintiffs' Quasi-Contract/Restitution Claims (Count IV)

Plaintiffs allege common law claims of quasi-contract and restitution from the Defendants.[7] "[T]he right to restitution or quasi-contract recovery is based upon unjust

---

[7] BMW FS argues that California does not recognize a claim for restitution. (Doc. No. 25 at 9.) BMW FS cites to the district court's analysis in Nordberg v. Trilegiant Corp., 445 F. Supp. 2d 1082, 110 (N.D. Cal. 2006), in support of its contention. But the district court

31

1   enrichment.  Where a person obtains a benefit that he or she may not justly retain, the

2   person is unjustly enriched." <u>Nordberg</u>, 445 F. Supp. 2d at 1101.  However, "[t]he fact that

3   one person benefits another is not, by itself, sufficient to require restitution.  The person

4   receiving the benefit is required to make restitution only if the circumstances are such that,

5   as between the two individuals, it is unjust for the person to retain it.  <u>McBride v. Boughton</u>,

6   123 Cal. App. 4th 379, 389 (Cal. Ct. App. 2004).  "[R]estitution may be awarded where

7   the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar

8   conduct.  In such cases, the plaintiff may choose not to sue in tort, but instead to seek

9   restitution on a quasi-contract theory. . . ." <u>Id.</u> at 388.

10      Plaintiffs allege that the Defendants were "unjustly enriched due to known defects

11  in Subject Vehicles #1, #2, and #3 through the use of funds that earned interest or otherwise

12  added to Defendant's profits when said money should have remained with Plaintiffs."

13  Compl. ¶ 120.  Defendants argues that Plaintiffs fail to allege that the Defendants received

14  any money or property from Amadi or that Defendants are in the possession of any funds

15  that rightfully belong to him.  (Doc. No. 25 at 10.)  Further, BMW FS states that the

16  Motowerks Plaintiffs' allegations are too vague for the Court to determine whether

17  Motorwerks is owed restation.  (Doc. No. 25 at 10. (stating "If SD Motorwerks completed

18  the BMW's sale to Amadi, rather than only allowing him to take possession, then it was

19  paid by Amadi and suffered no loss or need for restitution."))

20      The Court agrees that Plaintiffs failed to state a claim for restitution/quasi-contract

21  on behalf of Amadi.  The Court also agrees that Plaintiffs' factual allegations are unclear

22  as to whether the Motorwerks Plaintiffs received payment from Amadi that could preclude

23  recovery against BMW FS under quasi-contract/restitution.  Accordingly, the Court

24

25  _____

26  did not reach the clear conclusion that BMW FS suggests.  The Court views Plaintiffs to
    be bringing claims under quasi-contract and restitution, which are both based on the theory
27  of unjust enrichment.  <u>See</u> <u>First Nationwide Savings v. Perry</u>, 11 Cal. App. 4th 1657, 1670
    (Cal. Ct. App. 1992).
28

dismisses Plaintiffs' quasi-contract/restitution claims and grants Plaintiffs leave to amend to fix the deficiencies in their Complaint.

      E.    <u>Plaintiffs Euromotorwerks, Hagen, and Sorrento Claims Against BMW FS</u>

BMW FS argues that the only "direct allegations" against it relate to the auction sale of Subject Vehicle #1 to SD Motorwerks and subsequent possession of Subject Vehicle #1 by Amadi. (Doc. No. 25 at 3.) The only remaining claims against BMW FS are under the UCL and for restitution/quasi-contract. Both claims relate to SD Motorwerks purchase of the Subject Vehicle #1 from BMW FS through the Manheim auction. The Complaint indicates that only SD Motorwerks and Amadi were allegedly injured by the sale of Subject Vehicle #1. Compl. ¶¶ 32-62. The claims by Euromotorwerks, Hagen, and Sorrento appear to be merely derivative of SD Motorwerks's claim.

## III.    <u>Plaintiffs' Motion for Leave to Amend</u>

Plaintiffs request leave to amend their Complaint if the Court finds their allegations insufficient to state a claim for relief.[8] (Doc. No. 35 at 28.) A district court may deny a plaintiff leave to amend if it determines that allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency, or if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies. <u>Telesaurus</u>, 623 F.3d at 1003 (internal citations omitted). Plaintiffs have not previously amended their Complaint. Thus, the Court only considers whether amendment would be futile.

The Court will grant Plaintiffs leave to amend their complaint except the Court denies leave to amend regarding Plaintiffs' wire fraud claim (Count VI) as amendment of that claim is futile.

---

[8] Plaintiffs also requested leave to amend if the Court granted dismissal on the Motorwerks and Carfax motions. (Doc. No. 31 at 9-10; Doc. No. 37 at 13-14.) Since the Court transferred Plaintiffs' claims concerning Motorwerks and Carfax, Plaintiffs' request is moot as it relates to the Motorwerks and Carfax Defendants.

## **CONCLUSION**

The Court transfers Plaintiffs SD Motorwerks, Euromotorwerks, Hagen, and Sorrento claims (Counts I-VII) against Defendants Manheim Investments, Inc., Greater Nevada Auto Auctions, LLC, Manheim Riverside, Danny Braun, Cesar Espinosa, and Steve Harmon to the U.S. District Court for the Northern District of Georgia.  The Court also transfers Plaintiffs SD Motorwerks, Euromotorwerks, Hagen, and Sorrento claims (Counts I-VII) against Defendant Carfax, Inc. to the U.S. District Court for the Eastern District of Virginia, Alexandria Division.  The Court grants Plaintiffs leave to amend their complaint consistent with this Order.  Plaintiffs are ordered to file their amended complaint **on or before February 11, 2022.**

**IT IS SO ORDERED.**

DATED:      December 13, 2021

MARILYN L. HUFF, Senior District Judge
UNITED STATES DISTRICT COURT

3:21-cv-01205-H-JLB